UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| TINA DUNCAN, on behalf of<br>GABRIEL DOW, | Case No.: 3:10-CV-3084-AC |
| Plaintiff, | FINDINGS AND<br>RECOMMENDATION |
| v. | |
| MICHAEL ASTRUE, Commissioner<br>of Social Security Administration, | |
| Defendant. | |

_____

ACOSTA, Magistrate Judge:

Plaintiff G.D., a child ("G.D."), seeks judicial review of a final decision of the Commissioner

of the Social Security Administration (the "Commissioner") who denied him supplemental security

income benefits ("Benefits") under Title XVI of the Social Security Act (the "Act"). G.D. asks the

court to reject the Commissioner's decision, find him disabled, and remand this action to the Social

Security Administration (the "Agency") for an award of Benefits. For the reasons set out below, the

Page 1- FINDINGS AND RECOMMENDATION                                      {SIB}

Commissioner's decision should be affirmed.

PROCEDURE

On or about November 17, 2007, Tina Duncan, G.D.'s mother, filed an application for Benefits on G.D.'s behalf alleging G.D. was disabled due to limitations caused by attention deficit/hyperactivity disorder ("ADHD") and oppositional defiance disorder ("ODD"). The application was denied initially, on reconsideration, and by the Administrative Law Judge (the "ALJ") after a hearing. The Appeals Council denied review and the ALJ's decision became the final decision of the Commissioner.

FACTS

G.D. was born on May 17, 2002, to Duncan and Travis Dow. (Admin R. at 185-86). G.D. was taken away from Duncan and Dow by the Department of Human Services due to domestic violence, drugs, and alcohol, and placed with his maternal grandfather and grandmother in February 2004. G.D. lived with his grandparents for at least two years. (Admin R. at 186-88).

Shortly after filing for Benefits on G.D.'s behalf, Duncan completed a form in which she indicated that G.D. had no difficulty seeing, hearing, talking, or communicating. (Admin R. at 103-06). She represented that G.D. could recite numbers to three, could count three objects, knew his age, and could define common words, but could not recite numbers to ten, identify most colors or shapes, ask what words mean, read capital letters of the alphabet, or understand a joke, and did not know his birthday or telephone number. (Admin R. at 107). G.D. could ride a big wheel, tricycle, or bike with training wheels; wind up a toy; and use scissors, but could not catch a large ball, print letters, or copy his first name. (Admin R. at 108). He did not enjoy being with other children the same age, show affection toward other children, share toys, take turns, or play board games, but he

was affectionate to his parents, played "pretend" with other children, and played games like tag and hide-and-seek. (Admin R. at 108). Duncan indicated that G.D. usually controlled his bowels and bladder during the day, ate with a fork and spoon by himself, dressed himself without help except for tying his shoes, put his toys away, and washed or bathed and brushed his teeth without help, but had an attention span of only two to three minutes. (Admin R. at 109).

Teachers and administrators at G.D.'s school participated in meeting on November 29, 2007, to determine if G.D. qualified for an individualized education plan ("IEP"). Notes from that meeting indicate that G.D. is very bright and energetic and has as great sense of enthusiasm. (Admin R. at 122). Despite his ADHD diagnosis, G.D. performed within the average range in verbal, nonverbal, and IQ composite testing, knew all of his colors and the parts of his body, could count and recognize numbers through ten, knew most of the alphabet, had excellent directional skills, and could follow one- to three-step directions. (Admin R. at 122). G.D. was found to qualify for an IEP to assist in increasing his readiness skills and was provided 240 minutes a week in the resource room working on reading and written language readiness. (Admin. R. at 128.) This readiness support was supplemented daily in the classroom with the teacher allowing G.D. extra time to finish projects, checking in with G.D. regularly to make sure he understood the lesson and to redirect him when necessary, and providing visual aids. (Admin R. at 128).

On January 24, 2008, Christina N. Bruner, G.D.'s kindergarten teacher, indicated that G.D. had readiness skills for reading, math, and written language, and was receiving special education services for thirty minutes a day, four times a week. (Admin R. at 113). In the area of acquiring and using information, Bruner felt that G.D. had no problem in comprehending oral instructions, understanding school and content vocabulary, understanding and participating in class discussions,

providing organized oral explanations and adequate descriptions, and applying problem-solving skills in class discussions; a slight problem in comprehending and doing math problems, learning new material, and recalling and applying previously learned material; and an obvious, but not serious, problem with reading and comprehending written material and expressing ideas in written form. (Admin R. at 114). In the area of attending to and completing tasks, Bruner indicated that G.D. had no problem paying attention when spoken to directly, carrying out single step instructions, waiting to take turns, and organizing his own things and school materials; a slight problem in sustaining and paying attention during play/sports activities, refocusing to task when necessary, carrying out multi-step instructions, changing from one activity to another without being disruptive, completing class/homework assignments, completing work accurately without careless mistakes, and working at a reasonable pace/finishing on time; and an obvious, but not serious, problem with focusing long enough to finish assigned activity or task, and working without distracting self or others. (Admin R. at 115).

On May 19, 2008, Duncan indicated that G.D. was taking medication but that he had not yet stabilized, and that she could no longer take G.D. out in public due to behaviors caused by ADHD and ODD. (Admin R. at 132). Approximately six months later, Duncan represented that G.D.'s behavior was getting worse – he was stealing, lying, and sneaking things and was physically abusive. (Admin R. at 142, 145). G.D. had more bad days then good days at school and at home, and his medications were still in flux. (Admin R. at 142).

On April 1, 2009, Luis Idrogo, G.D.'s first grade teacher, wrote the following about G.D.:

> In asking to write up a short paragraph regarding G.D.'s behavior, I would like to say that everything is fine and dandy but of course, it is not. G.D. exhibits many different behavior patterns that I find quite distressing which keeps him from reaching his full

learning potential.    I believe he has been diagnosed as ADHD and requires medication at certain times of the day.  Because of this, it is quite a challenge getting G.D. to stay on task for any period of time which leads to his peculiar behavior.  He is constantly out of his seat wandering around the room interrupting other students. If he is in his seat, he is more engaged with other materials in or around his desk that it truly affects his attention span.  I constantly have to remind him to stay on task which is getting to be a chore in itself.  He will play with anything he can find and usually ends up throwing things on the floor, flicking materials across the room, tying and untying his shoelaces or taking the laces off altogether, or ends up draped all over his desk.

On the positive side, I can say that G.D. is trying and when under the right dosage of medication, he is a fun and enjoyable student to have in the classroom. He is very bright and is making great strides to meet the expectations of the class that have been set before him.  He has a great personality and the other students enjoy having him as a classmate.  His reading and math scores have gone up which tells me he is really trying to do the right thing but this behavior is far and few between.  I hope that he gets the necessary help that will enable him to fully succeed in the classroom and meet his full potential.

(Admin R. at 152).  Two months later, Idrogo reported that:

I have seen great improvements in his overall behavior and can see a change in his academic performance.  G.D. is a much more confident student in the classroom and his scores reflect this new-found confidence.  I believe he is now under the right medication and it reflects in his overall performance.  For the past month or so, he has done very well in the classroom and I must say it is great having him participate and engage in all that we do.  It is a pleasure having him in class and it is great to see him succeed and be part of such a wonderful atmosphere.

(Admin R. at 152).

On September 29, 2009, Angel Lyles, G.D.'s second grade teacher, Cynthia Fee, special education teacher, and Cindy Moore, principal, participated in an annual IEP meeting.  (Admin R. at 169).  The notes from the meeting indicate that G.D. was not performing satisfactorily in reading and math and was often having trouble controlling his energy.  (Admin R. at 171).  The resulting IEP involved direct instruction in the resource room on a daily basis for sixty minute in reading and thirty minutes in math.  (Admin R. at 171).  When G.D.'s "activeness and talkativeness" interfered with

his education, he was directed to a calming space in the resource room or other appropriate area. (Admin R. at 171).   Additionally, the school provided G.D. with extra materials to stimulate his mind during down periods in the classroom.  (Admin R. at 176).

Lyles indicated on January 19, 2010, that G.D. was unable to focus or sit still and was extremely disruptive when he was not on his medication, but that "he can work quietly, participate in whole group and small group activities, and can focus enough to answer questions and be an asset to the class" when he is on his medication.  (Admin R. at 157).   In response, Moore created an action plan for the days when G.D. arrived at school "non-medicated", which included sending him to the resource room where he could be redirected with the computer and a quieter atmosphere. (Admin R. at 157).  At that time, the school was only authorized to give G.D. medication after lunch. (Admin R. at 163).

Also in the record are letters from third-parties regarding G.D.'s behavior.  Britany and Lauren Guerra, close family friends, wrote that:

> G.D. misbehaves badly by acting out crying the whole time he is here with us, G.D. refuses to eat, he refuses to listen when asked to do something.  Example picking up toys, he has stolen from my home broke things he sometimes yells at who he is mad at, he oc[c]as[]ionally will not interact with the two other children and if he does he acts like the boss and is in control of the playing.

(Admin R. at 156).   Rosalee J. Haschley, G.D.'s maternal grandmother, indicated that: "G.D. constantly breaks all his toys and those of his brothers.  He constantly screams and cries for no reason, especially if he doesn't get his way about something."  (Admin R. at 179, 185).  Geoffry Ford, G.D.'s babysitter for three years, reported that:

> Everything is a fight with him.  When its time to eat he will not eat anything he does not want at that time, if he is told that what has been made is what he is to eat because a special meal will not be made for him every time it is time to eat he goes

in to a fit of crying & screaming for hours or until he gets his way.  He does & will lie about anything & everything all day, he gets aggres[s]ive when things are taken from him, he steals from stores & private resid[e]nces alike, he does the exact opp[o]site of what is asked of him, he has no respect or regard for his or anyone elses possessions.  He breaks, loses, hides or throws away his & other peoples things without any remorse.

(Admin R. at 180-81).

### Testimony

G.D. was seven years old and in kindergarten at the time of the hearing.  He testified that he does well in school, gets all A's and A+'s, has some friends at school, and colors or plays computer games with his friends after school.  (Admin R. at 28-29).  He stated he does pretty well at home but doesn't do everything his Mom tells him to do.  (Admin R. at 29).  G.D. did not know his birth date or his mother's phone number but stated that his principal knew how to get in contact with her if there was a problem at school.  (Admin R. at 30).  He testified he sleeps well on occasion, stays up until one in the morning, and does not like to get up early to go to school.  (Admin R. at 30-31).

Duncan contradicted some of G.D.'s testimony.  She indicated that he has problems at school all the time.  (Admin R. at 32).  He talks all the time and crawls around on the floor.  (Admin R. at 32). When he becomes too disruptive, he is sent to the special education teacher, who has him work on a computer with headphones while weighted down with a vest or pillow across his legs, which makes him feel more secure.  (Admin R. at 32, 40).  G.D. is able to work well on the computer and is able to play his Nintendo Wii for hours, if Duncan will let him.  (Admin R. at 41).

Duncan indicated that G.D. did not have any friends at school because he argues with other children, tries to be the boss in all situations, and takes other kids' toys.  (Admin R. at 32).  This same behavior continues at home where he is constantly fights with his brothers, breaks every toy

in the house, and refuses to eat or sleep.  (Admin R. at 32-33).  When he was at his aunts' houses, he refused to eat, screamed and cried for hours, broke his cousins' toys, refused to obey, and kicked the animals.  (Admin R. at 39-40).  He is not longer allowed at either of his aunts' houses.  (Admin R. at 39-40).

Duncan testified that G.D.'s baby sitter, who watched G.D. for about three years while Duncan cared for her ailing parents, reported that G.D. cried regularly for no reason for extended periods of time.  (Admin R. at 37).  He is especially emotional on the evenings his father calls and will cry for hours until Duncan is able to calm him down.  (Admin R. at 37).

Duncan attempts to put G.D. to bed at eight in the evening, but he watches television, drinks, eats, and plays with the dog and his toys until sometime between one and three in the morning, when he finally falls asleep.  (Admin R. at 33).  He is often tardy to school because he doesn't get ready in time and will miss the bus.  (Admin R. at 38).  On those occasions when Duncan is not at home, G.D. will miss the entire day of school.  (Admin R. at 38).

G.D. has difficulty riding the school bus.  (Admin R. at 41).  He will not stay in his seat, throws his jacket on the floor, smacks other children on the back of their head and is just generally disruptive.  (Admin R. at 41).  He has been kicked off the bus more than once in the past and is close to not being allowed the ride the bus at all.  (Admin R. at 41).

Duncan initially noticed G.D.'s behavioral issues when he was five and applied for Benefits at that time.  (Admin R. at 38).  G.D. would not sleep or eat, he broke and stole things and then lied about what happened, and he had no remorse.  (Admin R. at 38). G.D. currently takes medication every morning and then again at lunch.   (Admin R. at 34).  When he is on his medication, he tests well and focuses at school but his class work is "iffy." (Admin R. at 34).  He was recently prescribed

a new medication to assist with his sleep problems and aggression.  (Admin R. at 35).

### Medical Evidence

While examining G.D. for complaints related to a stuffy nose and dry cough in December 2005, Lawrence L. Cohen, M.D. commented that G.D. was quite wild and all over the office, that his grandparents didn't seem to the be able to handle him, and that, as a result, it was difficult for him to determine if G.D. was hyperactive.  (Admin R. at 35).  On June 27, 2007, a well-child assessment form revealed that G.D. was going to kindergarten, was having no problems with social interaction, performance, behavior, attention, or homework while at school, and was only having difficulties with his siblings while at home.  (Admin R. at 213).  On October 31, 2007, Duncan reported that G.D. was very aggressive at times, had a very short attention span, was very impulsive, and had always been hyperactive.  (Admin R. at 212).  A doctor prescribed Focalin, which seemed to alleviate the attention and hyperactivity issues but not the aggression.  (Admin R. at 212).  On November 22, 2007, G.D.'s medication was changed to Strattera and, on December 5, 2007, Duncan reported that G.D.'s aggression, attention, hyperactivity, and school work were all much better until the medication wore off in the afternoon.  (Admin R. at 210).  The doctor prescribed an additional dosage of Strattera to be administered in the afternoon as well.  (Admin R. at 210).

In late 2007, Edwin Tuhy, O.D., examined G.D. and determined that while he was very mildly hyperopic, his eye examination was perfectly normal and he was not in need of glasses or contact lenses.  Dr. Tuhy concluded that "that neither this patients eyes nor his vision preclude him from doing any age appropriate tasks . . . ."  (Admin R. at 219-20).

On March 18, 2008, Paul Rethinger, Ph.D., reviewed the file at the request of the Commissioner and found that G.D. was properly diagnosed with ADHD, but he was not disabled.

(Admin R. at 45). Dr. Rethinger determined that G.D. had less than marked limitations in the areas of acquiring and using information, attending to and completing tasks, interacting and relating with others, and caring for himself, and no limitation in the areas of moving about and manipulating objects and health and physical well-being. (Admin R. at 223-24). Frank G. Lahman, Ph.D., affirmed the diagnosis and conclusion on September 4, 2008. (Admin R. at 46).

Robert Sears, M.D., examined G.D. on April 8, 2009, for complaints of disruptive behavior at school, increased aggression both at home and at school, and difficulty sleeping. (Admin R. at 234). By this time, G.D. was taking both Strattera and Concerta twice a day. (Admin R. at 234). Dr. Sears increased the morning Concerta dosage and eliminated the afternoon dose to lessen the sleeping problems. (Admin R. at 234). G.D.'s substitute teacher referred him to Kathleen Noonan, M.Ed., on April 16, 2009, for counseling because he was continually out of his seat and unable to stay focused. (Admin R. at 236). Noonan worked with G.D. on brain exercises and recognizing various feelings and G.D. returned to class in a better mind set. (Admin R. at 236). On May 14, 2009, Duncan reported that G.D. was doing well at school and at home. (Admin R. at 233). On August 18, 2009, Duncan stated that G.D. had an uneventful summer, that he was eating all of the time, that there were no behavioral issues, and that she was pleased with him. (Admin R. at 231).

**ALJ Decision**

The ALJ found that G.D. had not engaged in substantial gainful activity and that he suffered from the severe impairment of ADHD. (Admin. R. at 12.) He acknowledged that Dr. Tuhy determined G.D. to be very mildly hyperopic but found that any vision impairment from this condition was not severe. (Admin. R. at 12.)

The ALJ found Duncan to be not entirely credible based on contradictions between her

Page 10- FINDINGS AND RECOMMENDATION                    *{SIB}*

testimony and other evidence in the record.  (Admin R. at 14).  The ALJ noted that while Duncan

testified at the hearing that G.D. had lived with her his whole life, state records indicated that G.D.

was in his grandparents care for at least two years and that during part of this time, Duncan was in

a rehabilitation center for drug and alcohol abuse.  (Admin R. at 14).  This is supported by G.D.'s

grandmother's testimony that she had cared for G.D. and his siblings "off and on since the day they

were born."  (Admin R. at 14).  He later recognized that Duncan's testimony with regard to G.D.'s

restrictions from his ADHD was contradicted by her own reports to G.D.'s primary care provider

concerning the efficacy of medications, his ability to complete school work, and his sleeping and

eating habits.  (Admin R. at 14).

      The ALJ acknowledged the third-party statements from a relative, a babysitter, and close-

family friends regarding G.D.'s behavior at home.  (Admin R. at 14).  He accepted the statements

as descriptive of their perceptions of G.D.'s limitations, but found that they were not indicative of

G.D.'s functional limitations and were not fully consistent with the medical and school records.

(Admin R. at 14).

      The ALJ found that G.D. had marked limitations in interacting and relating with others,

finding this to be his most restricted area of functioning.  (Admin R. at 19-20).  The ALJ took into

account the form competed by Mr. Idrogo, the third-party statements, to the extent they are accepted

as true, and the evidence that G.D. had difficulty with boundaries, bossed around or avoided other

children, and was disruptive in the classroom and on the bus.  (Admin R. at 20).  The ALJ

determined that G.D. had less than marked limitations in three areas: 1) acquiring and using

information, relying primarily on Ms. Bruner's assessment and the continuing individualized

education program in areas of reading and math; 2) attending to and completing tasks, noting that

school records and Mr. Idrogo's statements support this finding; and 3) caring for himself, indicating that G.D.'s sleep issues were related to a medication change and were resolved, and that other limitations identified by Duncan were not corroborated by medical or school records. (Admin R. at 17, 18, 22). The ALJ found that G.D. had no limitation in moving about and manipulating objects, or in health and physical well-being. (Admin R. at 21, 22). In the absence of a finding of extreme limitation in one area of functioning, or of marked limitation in two areas of functioning, the ALJ concluded that G.D. had not been disabled since November 3, 2007. (Admin R. at 23).

<u>STANDARD OF REVIEW</u>

This court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g)(2007); *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). The court must weigh "both the evidence that supports and detracts from the [Commissioner's] conclusions." *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986). The Commissioner's decision must be upheld, however, even if the "evidence is susceptible to more than one rational interpretation." *Andrews v Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). The burden of proof to establish a disability rests upon the claimant. *Drouin v. Sullivan*, 966 F.2d 1255, 1257 (9th Cir. 1992).

A three-step sequential evaluation is used to assess claims of childhood disability. 20 C.F.R. § 416.924. The first question is whether the child is working. *Id*. A child who is working is not disabled within the meaning of the Act. The second question is whether the child has a medically

determinable "severe" impairment or combination of impairments. *Id*. If the child has a severe impairment or combination of impairments, the question at the third step is whether the child's severe impairment or impairments meets, medically equals, or functionally equals the severity of an impairment in the listings. *Id*.

A child's functional limitations are evaluated in six areas. 20 C.F.R. 416.926a(b)(1). These include: (1) acquiring and using information; (2) attending to and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for himself; and (6) health and physical well-being. *Id*.

A medically determinable impairment or combination of impairments functionally equals a listed impairment if it results in "marked" limitations in two areas of functioning or in an "extreme" limitation in one domain. 20 C.F.R. § 416.926(e)(2). A limitation is "marked" if an impairment seriously interferes with the child's ability to independently initiate, sustain, or complete activities.

## DISCUSSION

G.D. asserts that the ALJ erred in failing to credit third-person reports without adequate explanation and that the improperly discredited testimony supports a finding that G.D has marked limitations in the two areas of attending to and completing tasks, and acquiring and using information. A finding of a marked limitation in either of these two areas, coupled with the ALJ's finding that G.D. has marked limitations interacting and relating with others, would require a finding of disability under the Act.

The ALJ has a duty to consider lay witness testimony. *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001). Friends and family members in a position to observe the claimant's symptoms and daily activities are competent to testify regarding the claimant's condition. *Dodrill v. Shalala*, 12 F.3d

915, 918-19 (9th Cir. 1993).   The value of lay witness testimony lies in their eyewitness observations, which may "often tell whether someone is suffering or merely malingering." *Dodrill*, 12 F.3d at 918. The ALJ may not reject such testimony without comment, but he may reject lay testimony inconsistent with medical evidence. *Lewis*, 236 F.3d at 512; *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996). If an ALJ rejects lay witness testimony entirely, he must give reasons germane to the witness. *Dodrill,* 12 F.3d at 919.

The ALJ found Duncan to be not entirely credible because her testimony was contradicted by state records, medical records, and the testimony of her mother.  The ALJ's reasons were germane to Duncan and were supported by the record.  With regard to the third-party statements, the ALJ acknowledged that the statements were descriptive of the authors' observations of G.D. but found that the evidence was not fully consistent with the medical and school records and was not indicative of G.D.'s functional limitations.  The third-party descriptions of G.D.'s behavior away from school – that he is emotional, has temper tantrums, refuses to listen or obey, breaks and steals things, is aggressive, and either does not play with others or bosses them around – is contradicted by both school records and Duncan's reports to G.D.'s doctors, as evidenced in the medical records.  Even if the descriptions were accepted as true, they are not relevant to the areas at issue  – G.D.'s ability to attend to and complete tasks, and acquire and use information.[1]  G.D.'s teachers remarked that G.D. was able to succeed in the classroom, work quietly, participate in group discussions and activities, and focus enough to answer questions, pay attention, and follow directions.  This was especially true when G.D. was on his medication.  This evidence is relevant to, and supports, the

---

[1]The ALJ did credit the third-party statements in the area of interacting and relating with others, to which the statements were relevant, and relied on these statements in finding that G.D. had marked limitations in this area.

ALJ's finding that G.D.'s ADHD does not seriously interfere with his ability to attend to and complete tasks, and acquire and use information. As with Duncan's testimony, the ALJ gave reasons for not giving full credibility to the third-party statements which were germane to the witnesses and were supported by the record.

The court finds that the ALJ did not err by failing to fully credit Duncan's testimony or the third-party statements. He gave proper reasons for rejecting the evidence, which reasons were supported by the record. The evidence does not require a finding that G.D. has marked limitations in either the area of attending to and completing tasks, or acquiring and using information. Accordingly, G.D. does not have two areas of marked limitations and is not disabled under the Act.

<u>CONCLUSION</u>

The Commissioner's findings on G.D.'s disabilities, considering the record as a whole, are supported by substantial evidence. The decision of the Commissioner should be affirmed.

<u>Scheduling Order</u>

The Findings and Recommendation will be referred to a district judge for review. Objections, if any, are due **December 6, 2011**. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 21st day of November, 2011.

/s/ John V. Acosta
JOHN V. ACOSTA
United States Magistrate Judge

Page 15- FINDINGS AND RECOMMENDATION                                    *{SIB}*